# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### GREENVILLE DIVISION

**DENICE RIGGINS, Administratrix of the**                         **PLAINTIFF**
**Estate of DAMION S. RIGGINS, Deceased and**
**Estate of Damion S. Riggins and Wrongful**
**Death Beneficiaries of Damion S. Riggins,**
**Deceased**

**V.**                                           **NO. 4:14-CV-110-DMB-JMV**

**CITY OF INDIANOLA, MISSISSIPPI;**
**STEVEN ROSENTHAL, Individually and in**
**his capacity as Mayor of the City of Indianola,**
**Mississippi; JANE EVANS, Individually and in**
**her capacity as City Clerk; RICHARD**
**O'BANNON, Individually and in his capacity as**
**Chief of Police; and JOHN DOES 1–5,**
**Individually and in their official capacities**             **DEFENDANTS**

## OPINION AND ORDER

Denice Riggins filed this § 1983 and state negligence action on behalf of the estate and wrongful death beneficiaries of her deceased son, Damion S. Riggins, seeking to recover damages for Damion's death, which occurred while he was detained at the City of Indianola Jail. Before the Court is the renewed summary judgment motion of City of Indianola, Mississippi; Mayor Steve Rosenthal; Police Chief Robert O'Bannon; and City Clerk Jane Evans. Doc. #73. Because Denice[1] has failed to show that a policymaker exercised deliberate indifference regarding Damion and that Damion suffered a constitutional deprivation, summary judgment will be granted on the § 1983 claim. The state negligence claim, in the interest of judicial economy, will be remanded to state court.

---

[1] To avoid confusion, the Court will refer to Denice Riggins and Damion Riggins by their first names.

# I
## Summary Judgment Standard

"Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). To award summary judgment, "[a] court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Norwegian Bulk Transp. A/S,* 520 F.3d at 411–12 (internal quotation marks omitted). To this end, "[t]he moving party bears the burden of establishing that there are no genuine issues of material fact." *Id.* at 412.

"If, as here, the nonmoving party bears the burden of proof at trial, the moving party may demonstrate that it is entitled to summary judgment by submitting affidavits or other similar evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998) (citation omitted). If the moving party makes the necessary demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate." *Id.* In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 191–92 (5th Cir. 2011) (citation and internal punctuation omitted). When considering a motion for summary judgment, the Court "resolve[s] factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

## II
## Relevant Facts

### A. Arrest

The circumstances surrounding Damion's tragic end began shortly before midnight on December 16, 2013. Sometime before 11:30 p.m., an unknown individual attempted to burglarize Spencer's Grocery, which is owned by Robert Kent. Doc. #36-1[2] at 1–2. Shortly after the attempted burglary, Kent flagged down Officer Marshall Hodge of the City of Indianola Police Department ("Department"). *Id*. at 5. Kent informed Hodge that Damion, who was walking nearby, matched the description of an individual who had recently attempted to burglarize his grocery store. *Id*. Hodge located Damion and initiated contact by "advis[ing] Damion] to come" and speak with him. *Id*. As Damion approached Hodge, he purportedly "began pouring out a bag of white powdery substance" and tossed the empty bag and other "contents of his pockets onto the ground." *Id*. During their conversation, Damion informed Hodge that "he had cocaine and that he poured it out when he saw [Hodge]." *Id*. Among the items Damion tossed to the ground, Hodge located "a screwdriver, two lighters, and an empty bag that contained white powder on the edges." *Id*.

Roger Triplett, who was standing in the street with Kent when he flagged down Hodge, witnessed the attempted burglary at Spencer's Grocery. *Id*. at 3, 5. Triplett "identified [Damion] as the suspect who he just saw pry tin off the side of Spencer's store using the screw driver he

---

[2] As previously noted in the Court's order denying Defendants' first motion for summary judgment:

> Doc. #36-1[] is the Indianola Police Department incident report. The parties heavily rely on hearsay statements, including statements in the incident report, in establishing the record. No party has objected to this form of evidence. Accordingly, the Court will consider the proffered evidence for the purpose of deciding the motion for summary judgment. *See BGHA, LLC v. City of Universal City, Tex.*, 340 F.3d 295, 299 (5th Cir. 2003) (in absence of hearsay objections, court did not err in considering hearsay affidavits for purpose of summary judgment).

Doc. #53 at 2 n.1. For this same reason, the Court will rely on the incident report in evaluating Defendants' renewed summary judgment motion.

threw on the ground." *Id*. at 5.  Based on Triplett's identification, Damion was arrested and charged with the attempted burglary of Spencer's Grocery.[3]  *Id*. at 1, 5.

At some point after Damion's arrest, his mother, Denice, called the police station and informed an unidentified male that Damion required "special attention."  Doc. #73-5 at 15.  It is unclear what time Denice placed this call.

### B. Booking and Placement in Cell

Around 12:20 a.m., Hodge arrived at the police station with Damion and was joined by Corporal Ozie Carter to begin the booking process.  Doc. #82-1[4] at 47.  Hodge took Damion's personal property while Carter conducted a search of Damion.  *Id.*  At Carter's request, Damion gave Carter the belt he was wearing.  *Id.*  Damion was then told he would be placed in a holding cell to await the completion of the booking process.  *Id.*

At 12:40 a.m., the officers attempted to place Damion in a holding cell.  Doc. #47.[5] Damion placed his hands on the doorframe bars of the cell, preventing the cell door from being

---

[3] This was not Damion's first encounter with the Department.  Since at least 2005, Damion has had multiple interactions with City police officers, including arrests and a late 2005 service call after Damion attempted to commit suicide by hanging himself with an RCA jack cord.  Doc. #45-2.

[4] Document #82-1 was filed by Denice as a composite exhibit totaling 105 pages and described simply as "Exhibits A-T."  Such filing violates the requirements of Local Uniform Civil Rule 7(b)(2), which instructs, among other things:

> All supporting exhibits must be denominated in the court's electronic filing system by both an exhibit letter or number *and* a meaningful description. Further, all supporting exhibits not already of record and cited in the … response …, must normally be filed under the same docket entry and denominated separately in the court's electronic filing systems as exhibits to the motion.

L.U. Civ. R. 7(b)(2) (emphasis in original).  Denice's failure to separate her response exhibits and describe each individually has caused the Court to have to search through the 105-page composite filing to find the precise exhibit referenced.  For ease of reference, pinpoint cites to the composite document will utilize the stamped CM/ECF page numbers.  Counsel is warned that the failure to adhere to the requirements of Rule 7(b)(2), or any of the Court's civil local rules, may result in sanctions.  *See* Preamble to Local Uniform Civil Rules ("Attorneys practicing before the district courts of Mississippi are charged with the responsibility of knowing the LOCAL RULES, … and may be sanctioned for failing to comply with them.").

[5] Document #47 is Defendants' notice of the conventional filing of their Exhibit B, which is the surveillance video of the Department's holding cell area.  As there are clear discrepancies with the timelines provided by different defendants, for the sake of clarity, the timeline in this order will follow the time-stamped surveillance video, beginning when Damion was placed in the holding cell.  All references to this video will be cited to Document #47.

4

closed.  *Id.*  Two minutes later, Inspector Jerry Pate, Hodge, and Carter wrestled Damion to the ground in an attempt to clear the doorway.  *Id.*  Damion immediately fought to get back up and returned his hands to the bars, again preventing the door from being closed.  *Id.*  The officers again wrestled Damion to the floor, and this time placed Damion in handcuffs.  *Id.* (12:43 a.m.–12:44 a.m.).  Damion tried one last time to block the cell door from being closed by putting his foot in the doorway, but an officer pushed it out of the way and closed the cell door.  *Id.* Immediately upon the cell door's closing, Damion began violently kicking the door.  *Id.* (12:44 a.m.–12:46 a.m.).  While he was struggling with the officers, Damion "kept saying" "I'm not going back to jail.  I'm not going back to jail."  Doc. #82-1 at 66.

## C.  Damion's Suicide

After Damion was secured in his cell, Carter returned to patrolling duty and Pate went to interview Triplett and Kent as a part of the burglary investigation.  Doc. #82-1 at 66–67.  Pate instructed Hodge "to keep a check on [Damion and] made note to dispatch to also keep a check on him."[6]  *Id.* at 67.  Specifically, Pate told Hodge, "about every 15 minutes or so, if you can, just keep a check on him …."  *Id*. at 70.

At 12:46 a.m., Damion sat on the floor and passed his feet through his hands, moving his hands from being cuffed behind his back to being cuffed in front of him.  Doc. #47.  Damion then resumed kicking the door and briefly hit his head against the wall, with the kicking continuing for several minutes.[7]  *Id.* (12:46 a.m.–12:53 a.m.).  At 12:53 a.m., Damion reached through the bars and turned off the lights, effectively blacking out the view of the surveillance

---

[6] The dispatcher at the time was Kendrick Wash.  Doc. #82-1 at 57.  There is no evidence in the record describing the circumstances from Wash's perspective.

[7] Pate testified that the officers decided to handcuff Damion because he "started kicking and hitting and banging his head on the cell and stuff ...."  Doc. #82-1 at 66.  However, the surveillance video shows these events occurring after Damion was handcuffed.

video cameras until he turned the lights back on at 12:57 a.m. *Id. (*12:53 a.m.–12:57 a.m.). Damion unsuccessfully attempted to tie his shirt to the cell bars and then untied his shoelace. *Id.* (12:57 a.m.–12:59 a.m.). Damion removed his shoelace and tied it around his neck. *Id.* (1:00 a.m.). Damion proceeded to tie the shoelace around the cell door bar, turned around so his back faced the door and camera, and then assumed a sitting position – hanging himself. *Id.* (1:00 a.m.–1:01 a.m.). Damion's body convulsed for the next few minutes and then remained still. *Id.* (1:01 a.m.–1:06 a.m.).

### D. Discovery of Damion's Body

After completing his interviews with Triplett and Kent over a span of approximately forty minutes, Pate began the process of starting a case file on the burglary. Doc. #82-1 at 66–67, 69. As the first step of this process, Pate ran Damion's name through a criminal history report. *Id.* at 67. After what he estimated to be thirty or forty minutes, which, according to Pate, included a brief check on Damion in his cell,[8] Pate discovered that Damion had previously attempted suicide in "the first part" of 2005. *Id.* at 67, 71. Pate considered the prior suicide attempt to be "an alert" and, upon noticing that Damion "had been kind of quiet," "got up and immediately went down the hallway" to check on Damion. *Id.* at 67.

Upon discovering Damion with the shoelace around his neck, Pate called for Hodge, who carried a knife, and the two officers cut Damion down at approximately 2:10 a.m. Doc. #47 (1:06 a.m.–2:10 a.m.);[9] Doc. #82-1 at 67. Pate told Hodge to tell the dispatcher to call 911. Doc. #82-1 at 67. An officer checked Damion for a pulse. Doc. #47 (2:10 a.m.). No CPR was

---

[8] Insofar as Damion committed suicide within twenty minutes of being placed in the cell, Pate's recollection of a cell check before finding Damion's deceased body seems to be mistaken.

[9] Pate estimated he discovered Damion at approximately 12:40 a.m. Doc. #82-1 at 69. But, the surveillance video shows that Damion, who did not place the shoelace around his neck until approximately 1:00 a.m., was not cut down by the officers until 2:10 a.m., more than an hour later. Pate, who estimated that Damion arrived at the station at approximately 11:30 p.m., testified to a timeline that appears an hour behind the actual occurrence of events. *See* Doc. #82-1 at 68.

administered.  Paramedics arrived at 2:17 a.m. and began attempting to resuscitate Damion.  *Id.*

While the paramedics were working on Damion, Lieutenant Earnest Gilson, Pate's supervisor,

arrived at the police station to oversee the situation.  Doc. #82-1 at 101.  The paramedics, unable

to revive Damion, left at 2:26 a.m.  *Id.*

The Mississippi State Medical Examiner's Office autopsied Damion's body sometime on

December 17, 2013, and opined that he "died as a result of hanging" and "[t]he manner of death

is suicide."  Doc. #36-4 at 3.  Toxicology tests revealed the presence of "cocaine, ethanol, and

marijuana" in Damion's postmortem blood sample.  *Id*.

### E.  Training of Officers

Officers with the Department "receive 24 hours of in-service training per year.  Officers

are selected to attend classes sometimes based on what their particular needs are ...."  Doc. #82-1

at 54.  Chief O'Bannon makes the final determination for police officer training in Indianola.  *Id*.

In addition to their annual in-service training, Pate, Hodge, and Carter each completed the State

of Mississippi's Board on Law Enforcement Officer Standards and Training.  Doc. #36-8.  It is

undisputed that Department officers were not trained on how to prevent jail or holding cell

suicide.  Doc. #82-1 at 54.

### F.  Department Policies

According to Lieutenant Gilson, the Department does not maintain written policies, and

the unwritten policy, if any questions arose, was to "refer to the supervisor person."  Doc. #82-1

at 101.  Regarding the intake screening of prisoners to determine and evaluate mental conditions,

Pate testified that he knew of no established policy or procedure.  *Id*. at 75.  Carter testified that

at the time of Damion's detention, the Department did not have written policies regarding "steps to take ... with any individual whether they have a history or not."[10] *Id*. at 88.

O'Bannon testified, however, that, at the time of Damion's incarceration and suicide, the Department maintained an unwritten policy and procedure for handling individuals detained in its holding cell. Doc. #82-1 at 57–58. The policy provides that a dispatcher is to begin an individual jail log with the detainee's name when the detainee is placed in the cell. *Id*. at 57. The standard log form "is broken down by 15-minute increments, [a]nd … at least every 30 minutes, someone is supposed to physically check" on the detainee in the cell. *Id.*[11] It is the responsibility of the dispatcher to advise the supervisor on duty that 30 minutes have passed, and that someone needs to check on the detainee. *Id.* If the dispatcher has to leave, it is policy to find a replacement. *Id*. at 58.

Additionally, the dispatcher, who has video monitoring equipment surveilling the police station, is to "isolate that particular cell on the screen so they can monitor activity." *Id.* Beyond a dispatcher's other duties, including answering the phone and radio, the dispatcher is to "keep an eye on what's going on in that cell." *Id.* This policy is in place for any and all detainees, and is "the normal policy and procedure that is done every day." *Id.* Should something out of the

---

[10] According to O'Bannon, it was not his policy to hold individuals, such as Damion, for questioning. Doc. #82-1 at 56.

[11] A Department status log from the date Damion died shows two entries regarding Damion: (1) a 12:30 a.m. entry by Hodge reflecting a status of "10-2;" and (2) a 1:15 a.m. entry by Pate reflecting a status of "unresponsive." Doc. #82-1 at 105. The times of these updates are unusual given the timeline established by the surveillance video. Specifically, 12:30 a.m., the time Hodge reported "10-2," was before Damion's placement in the cell and 1:15 a.m., the time Pate reported Damion as unresponsive, was approximately fifty minutes before Damion's body was discovered unresponsive.

The meaning of "10-2" is unclear from the record. The definition of "10-2," under the standard used by the Association of Public Safety Communication, is "Signal Good." *See* Ontario Ministry of Community Safety & Correctional Services, Appendix B: Association of Public Safety Communication (APCO) "10" Codes, http://www.mcscs.jus.gov.on.ca/english/PSIS/BasicTesting/SecurityGuardStudyGuide/AppendixBAPCO/SG_appendixb_apco.html (last accessed July 20, 2016); *In re Katrina Canal Breaches Consol. Litig.*, 533 F.Supp.2d 615, 632 (E.D. La. 2008) ("The Fifth Circuit has determined that courts may take judicial notice of governmental websites.") (collecting cases).

ordinary arise regarding the holding cell policy and procedures, officers are to address all questions to the supervisor on duty. *Id.* at 59.

According to Pate, the officers were never informed, as a matter of policy, to "keep a check on" a person detained in the jail. *Id*. at 75. Pate however testified that the officers would keep a watch on the cell on their own. *Id.*

### III
### Procedural History

On July 3, 2014, Denice, Damion's mother, filed a two-count complaint in the Circuit Court of Sunflower County, Mississippi, seeking damages associated with Damion's death. Doc. #2. As defendants, the complaint names City of Indianola, Mississippi ("City"); Mayor Rosenthal, Police Chief O'Bannon, and City Clerk Evans, in their individual and official capacities; and John Does 1–5, in their individual and official capacities. *Id.*

On July 31, 2014, Defendants, asserting the existence of federal question jurisdiction, removed the state court action to this Court. Doc. #1. On February 6, 2015, Defendants filed a motion for summary judgment seeking the dismissal of "all Defendants with prejudice."[12] Doc. #36 at 3. Three days later, based on their assertion of an immunity defense, Defendants moved to "stay all discovery not related to the immunity issue" pursuant to Local Uniform Civil Rule 16(b)(3)(A). Doc. #38 at 2. On February 17, 2015, United States Magistrate Judge Jane M. Virden granted the motion, staying "the attorney conference and disclosure requirements and all discovery not related to the [immunity defense] pending the court's ruling on the motion, including any appeal." Doc. #39 (citing L.U. Civ. R. 16(b)(3)(B)). After seeking and receiving

---

[12] Defendants' motion for summary judgment did not expressly ask for the dismissal of all claims but such was logically inferred from their request that the Court "dismiss[] all Defendants with prejudice." Doc. #36 at 3; Doc. #53 at 5 n.6.

a short extension, Denice responded to the motion for summary judgment on March 10, 2015.[13] Doc. #45.  Defendants replied seven days later.  Doc. #48.

On September 22, 2015, the Court issued an order denying Defendants' motion for summary judgment.  Doc. #53.  The Court held summary judgment should be denied because discovery was still ongoing and the federal rules allow for "further discovery to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose."  *Id.* at 8.  The Court also held that qualified immunity was inapplicable in this case because Denice had only asserted a constitutional claim against "Defendant, City of Indianola, Mississippi."  *Id.* at 8–9.

On February 25, 2016, after discovery concluded, Defendants filed a renewed motion for summary judgment, again asking for the dismissal of "all Defendants with prejudice."  Doc. #73 at 2.  After seeking and receiving a three-week extension, Denice responded to the renewed summary judgment motion on April 4, 2016.  Doc. #82.  Defendants replied ten days later.  Doc. #85.

## IV
## Analysis

In Count I of the complaint, Denice asserts a claim under 42 U.S.C. § 1983 against the City for deliberate indifference to Damion's serious medical needs and for "depriving him of his right to be free from punishment and to due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution."  Doc. #2 at 3–5.  In Count II, Denice asserts a state law claim for negligence against the City and O'Bannon.[14]  *Id.* at 5–8.

---

[13] Denice originally filed the response on March 9, 2015.  Doc. #44.  The Clerk of the Court instructed her to refile the response to amend the document title, and to file the supporting memorandum as a separate docket entry.

[14] Count II, the state law claim, does not reference Mayor Rosenthal or City Clerk Evans.  While it does specifically allege that "Defendant Dispatcher John Doe was negligent … in his failure to monitor the video surveillance screen," Doc. #2 at 7, no identified person was ever added or substituted for such John Doe defendant.  And, though

Defendants have moved for summary judgment on three grounds: (1) "Plaintiff has failed to identify any deficiencies in City [sic], any deficiencies in training, or a pattern or practice of unconstitutional conduct which could subject the City to municipal liability;" (2) Mayor Rosenthal, Police Chief O'Bannon, and City Clerk Evans "had no direct involvement in this detainee suicide claim and are entitled to qualified immunity;" and (3) under the Mississippi Tort Claims Act, Plaintiff's claims are "barred by immunities." Doc. #73 at 1.

## A. Municipal Liability

"[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

In her complaint, Denice alleges:

> defendant City of Indianola maintained unconstitutional policies, customs and procedures in that said Defendant falsely arrested and detained Decedent for mere suspicion of burglary, failed to transport Decedent to mental health treatment facility, adequately staff the jail facility, maintained inadequate video monitoring systems and cell checks, maintained inadequate inventory procedures which failed to identify at-risk detainees, failed to train officers to identify and monitor at-risk detainees, [and] maintained inadequate in-take procedures which permitted dangerous items to remain with detainees ....

Doc. #2 at 3–4. In seeking summary judgment, Defendants argue that Denice's claim must fail because she cannot show the existence of a "defective policy duly adopted by the City" or that any City employee acted with deliberate indifference to Damion's rights. Doc. #74 at 10–12. Denice responds that her claim should proceed because Defendants maintained a "faulty custom or procedure for suicide screening" and because Defendants failed to adopt a "policy to detect

---

the last several paragraphs of Count II contain allegations about what "the actions and omissions of Defendants and each of them caused or contributed to Decedent's death," it would be more than a stretch to conclude that such allegations were intended to encompass Rosenthal and Evans in the absence of allegations of any specific acts or omissions by them, and where the only defendants mentioned are the City and O'Bannon. Ultimately, it remains unclear whether Denice has actually alleged a claim against the individual defendants. However, because this negligence claim will be remanded to state court for the reasons below, the Court will not address its scope.

risk factors for detainee suicide." Doc. #83 at 10. Denice also argues that her "training claim is viable." Doc. #83 at 12.

### 1. Policymaker

A policymaker is one who "speak[s] with final policymaking authority for the local government actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). "[W]hether a particular official has final policymaking authority is a question of state law." *Id.* (internal quotation marks and emphases omitted).

Under Mississippi law, "[t]he governing authorities of municipalities shall have the power to make all needful police regulations necessary for the preservation of good order and peace of the municipality and to prevent injury to, destruction of, or interference with public or private property." Miss. Code Ann. § 21-19-15(1). However, "[a] city's governing body may delegate policymaking authority (1) by express statement or formal action or (2) it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010) (internal quotation marks omitted).

Defendants contend that "[n]one of the individual capacity defendants had policy making authority over the holding cell at the City of Indianola Jail ...." Doc. #74 at 11. Denice argues that O'Bannon, the Chief of Police, "made official municipal policy" for the City of Indianola. Doc. #83 at 9. Denice does not, however, point to a delegation, whether express, or implied, of such authority.

To be sure, O'Bannon testified that he wrote policies for the Department. *See* Doc. #82-1 at 62. In the absence of a delegation, however, the Court cannot label O'Bannon a policymaker within the meaning of § 1983. *See Smith v. City of Wiggins*, No. 1:14-cv-26, 2015 WL 6872230,

at *9 (S.D. Miss. Nov. 9, 2015) ("Plaintiff has cited no authority under Mississippi law for the proposition that Chief Barnett was a final policymaker for the City of Wiggins. Nor has Plaintiff presented any evidence that the City of Wiggins delegated final policymaking authority to Chief Barnett."); *Moreno v. City of Dallas*, No. 3:13-cv-4106, 2015 WL 3890467, at *5 (N.D. Tex. June 18, 2015) ("Due to the absence of clear factual assertions indicating the delegation of authority to the Chief of Police, Plaintiff's complaint is deficient in asserting that the Chief of Police is the final policymaker for the Dallas Police Department."). Accordingly, Denice has failed to satisfy the first element of her § 1983 claim. *See Reyes v. City of Plainview*, 362 F. App'x 423, 425 (5th Cir. 2010) ("The Ceballos Family has failed to produce summary judgment evidence that Police Chief Mull-the only alleged policymaker identified-was an official policymaker for the City. His acknowledgment of responsibility for his department does not convert him into the City's policymaker."); *Neyland v. Henley-Young Juvenile Justice Ctr.*, No. 3:09-cv-520, 2011 WL 1980276, at *4 (S.D. Miss. May 20, 2011) ("To sustain liability under § 1983, Neyland must identify a policymaker with final policymaking authority.") (collecting cases) (internal quotation marks omitted).

## 2. Policy

The Fifth Circuit has held that official policy may be:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984).

In order for a policy to support liability under § 1983, the policy must have been "promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Piotrowski*, 237 F.3d at 579 (internal quotation marks omitted). Under this standard, a decision *not* to adopt or promulgate a policy may serve as a basis for liability if the decision "amount[s] to an intentional choice, not merely an unintentionally negligent oversight." *Evans*, 986 F.2d 104, 108 (5th Cir. 1993). "[E]ach and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff, and it must be determined whether each one is facially constitutional or unconstitutional." *Piotrowski*, 237 F.3d at 579–80.

In their motion for summary judgment, Defendants argue that Denice cannot establish that any policy adopted by a policymaker was promulgated with deliberate indifference. Doc. #74 at 11–12. In her response, Denice challenges three matters which she classifies as policies: (1) the failure to adequately train jail officers to "recogniz[e] at risk detainees and monitor[] them properly," which Denice argues violated Damion's constitutional right to receive proper medical treatment while a pretrial detainee; (2) the failure to adopt a "written policy and procedure handbook ... for anything with regards to the City's holding cell;" and (3) the failure to adopt a specific written policy for suicide prevention. Doc. # 83 at 8, 10, 13.

"Pretrial detainees are protected from harm by virtue of the Due Process clause of the Fourteenth Amendment, while convicted inmates are protected from harm by the Eighth Amendment's prohibition against cruel and unusual punishment." *Earrey v. Chickasaw Cty.*, 965 F.Supp. 870, 873–74 (N.D. Miss. 1997) (collecting cases). Furthermore, "[u]nder the Fourteenth Amendment, jail officials must adequately protect pretrial detainees from their known

suicidal impulses. Jail officials violate this constitutional right if they had actual knowledge of the *substantial risk* of suicide and responded with deliberate indifference." *Branton v. City of Moss Point*, 261 F. App'x 659, 661 (5th Cir. 2008) (emphasis in original; internal citations and quotation marks omitted) (citing *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996) (en banc)). "Because the suicide of a pretrial detainee implicates both the state's duty to provide medical care and its duty to provide protection from harm, failing to provide pretrial detainees with medical care and adequate protection from their known suicidal impulses is a violation of the Fourteenth Amendment." *Shepard v. Hansford Cty.*, 110 F.Supp.3d 696, 708 (N.D. Tex. 2015) (internal citations omitted).

"In *Hare*, the Fifth Circuit adopted the subjective deliberate indifference test to determine when the episodic acts or omissions of an individual county official violate a pretrial detainee's right to medical care and protection from harm under the Fourteenth Amendment." *Id*. "To prove a violation of the Fourteenth Amendment under the subjective deliberate indifference test, a plaintiff must establish two elements: (1) that the defendant had subjective knowledge of a substantial and serious risk that the pretrial detainee might commit suicide; and (2) that the defendant nevertheless disregarded the risk of suicide by responding to it with deliberate indifference." *Id*. Accordingly, for a policy, including a decision not to adopt a policy, to have been promulgated with deliberate indifference to Damion's Fourteenth Amendment rights, the policy must have been issued despite known or obvious risks that such a violation would occur.

### a. Failure to train

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "A

municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* To establish liability under § 1983, "a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id.* (internal alterations and quotation marks omitted). To establish deliberate indifference with regard to training, a plaintiff must show that policymakers were "on actual or constructive notice that a particular omission in their training program causes [municipal] employees to violate citizens' constitutional rights." *Id.*

Within the context of a failure to train claim, "[d]eliberate indifference can be proven in two ways. First, plaintiffs can show that a pattern of similar incidents put the municipality on notice that its training was producing unconstitutional results." *Anderson v. Marshall Cty.*, 637 F. App'x 127, 134 (5th Cir. 2016). *Accord*, *Kitchen v. Dallas Cty.*, 759 F.3d 468, 484 (5th Cir. 2014). Alternatively, "plaintiffs can show that the 'single incident exception' applies, in which case proving a pattern is unnecessary." *Id.* To qualify for the single incident exception, a plaintiff must show "a constitutional violation would result as the highly predictable consequence of a particular failure to train." *Id.*, 759 F.3d at 484 (internal quotation marks omitted).

In this case, there is no evidence of a pattern of similar incidents which may have put the City on notice of the risk of suicide in the holding cell. Accordingly, Denice is left to satisfy the single incident exception.

In her brief opposing summary judgment, Denice argues that "the officers involved were never trained on any policy for monitoring any detainees, but [sic] specifically detainees with the obvious medical needs such as the Decedent." Doc. #83 at 13. Denice also seems to argue that the City failed to train its officers for "recognizing at risk detainees." *Id.* at 12. In this regard,

Denice offers the deposition testimony of her "jail operation's [sic] expert, Jeff Eiser,"[15] who testified that it is "important to have training or policies on the recognition and the interpretation of signs of behavior ...."[16] Doc. #82-1 at 95.

> With regard to training to detect suicidal detainees, the Fifth Circuit has held:
>
> A municipality should be required to provide its police officers with minimal training to detect "obvious medical needs of detainees with known, demonstrable, and serious mental disorders." Police personnel are not required to "unerringly detect suicidal tendencies;" such an exacting standard "requires the skills of an experienced medical professional with psychiatric training...." Recognizing these practical realities, ... detainees have no absolute right to a complete psychological examination. Absent such a right, the failure to train custodial officials in screening procedures to detect latent suicidal tendencies does not rise to the level of a constitutional violation.

*Evans*, 986 F.2d at 107–08 (internal citations and emphases omitted).

Here, while there is no dispute the City did not provide training in suicide detection, Denice has offered no evidence that the training which *was* provided, which included a state certification course and twenty-four annual hours of training, did not provide minimal training to detect obvious medical needs of detainees. In the absence of such evidence, the Court must conclude that the failure to provide training on suicide detection cannot support Denice's § 1983 claim. *See Jones v. Houston Indep. Sch. Dist. Bd. of Trs.*, 986 F.Supp.2d 812, 819 (S.D. Tex. 2013) ("In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts.") (citing *Little*, 37 F.3d at 1075).

---

[15] Denice has not submitted any evidence regarding Eiser's qualifications. Defendants, however, have not objected to Eiser's proposed qualification as an expert in jail operations. Accordingly, the Court will consider Eiser an expert for the purpose of deciding Defendants' motion for summary judgment. *Dean v. Chrysler Corp.*, 38 F.3d 568, 1994 WL 574188, at *5 (5th Cir. 1994) (unpublished table decision) ("Dean's failure to object below to Love's qualifications as an expert witness and to defects in his affidavit as summary judgment evidence in Dean's opposition to the motion for summary judgment waives Dean's right to raise that challenge on appeal.").

[16] Eiser testified that Damion's behavior in the holding cell, his potential ingestion of drugs, and his past history of suicide attempts should have caused the officers to "observe[] him on a more regular basis." Doc. #82-1 at 94. Eiser also opined that Damion's behavior and potential drug use alone should have been sufficient to warrant increased observation. *Id.* at 96.

As for the lack of training for monitoring detainees, the Court notes that it is undisputed that the City maintained a policy, albeit unwritten, on monitoring detainees in the holding cells. It appears, however, that this policy was not disseminated to many, if any, officers. While this absence of training is concerning, the Court cannot conclude that a constitutional violation, such as an officer's deliberate indifference to a substantial and serious risk of suicide, is a *highly probable* consequence of such a failure to train particularly where, as here, the Department maintained a practice (if not a policy) of monitoring detainees. *Cf. Wereb v. Maui Cty.*, 830 F.Supp.2d 1026, 1034–35 (D. Hawaii 2011) (applying single incident exception where "County gave ... *no* training on how to monitor detainees, **and** *no* training on how to monitor for deprivation of 'serious medical needs'") (internal footnote omitted; second emphasis added). Therefore, Denice's failure to train claim must fail.

### b. Failure to adopt written policy for holding cells

Denice argues that the failure to have a written policy for holding cell procedure was deliberate indifference because, according to her "jail operations expert," "anytime you have a holding cell ... you have to have guidelines for the staff on what to do ... cause staff will change." Doc. #83 at 10 (citing Doc. #82-1 at 100).

The Fifth Circuit has held that "the validity of prison policies is not dependent on whether they are written or verbal. A policy is a policy ...." *Brumfield v. Hollins*, 551 F.3d 322, 327 (5th Cir. 2008). In this case, there is no dispute that the City maintained an unwritten, albeit poorly promulgated, policy regarding surveillance of the holding cells. Under this policy, a camera was to be trained on the detainee's holding cell, the dispatcher was to keep an eye on the camera feed, and an officer was to physically check on the detainee at least every thirty minutes. Even accepting Eiser's testimony that a detention facility *should* maintain a written monitoring

policy, which is insufficient standing alone to establish deliberate indifference,[17] there is no evidence that the failure to adopt a *written* policy for monitoring the holding cells was *likely* to lead to constitutional violations. Put differently, while the evidence is undisputed that a written policy would have been *better* than an unwritten policy, there is no evidence that the maintenance of an unwritten policy rose to the level of deliberate indifference. *See Rhyne v. Henderson Cty.*, 973 F.2d 386, 393 (5th Cir. 1992) ("Arguably the jury might conclude that the Sheriff was negligent in not requiring more continuous observation, but that, of course, is not enough under § 1983."); *see also Coleman v. Wetzel*, No. 1:15-cv-847, 2015 WL 10381754, at *7 (M.D. Pa. Dec. 28, 2015) ("Even if the cell assignment policy did not comport with best practices ... these shortcomings do not meet the high standard of actual knowledge that is required to show deliberate indifference."). In the absence of such evidence, the failure to maintain a written policy for holding cells is insufficient to support municipal liability.[18]

### c. *Failure to adopt written policy for suicide prevention*

Denice argues that "it is quite obvious that the likely consequences of ... not adopting [a] policy to detect risk factors for detainee suicide will be a deprivation of detainees' civil rights." Doc. #83 at 10. As explained above, the failure to adopt a policy or procedure may rise to the level of an affirmative policy for the purpose of establishing § 1983 liability if "the likely consequences of not adopting a policy will be a deprivation of civil rights." *Evans*, 986 F.2d at 108 (internal quotation marks omitted).

---

[17] *See Thompson v. Upshur Cty.*, 245 F.3d 447, 459 (5th Cir. 2001) ("Standing alone, an expert's opinion is generally not enough to establish deliberate indifference.").

[18] To the extent Denice argues that the unwritten policy itself was insufficient, such argument must also fail. Denice has offered no evidence that a policy of dedicated monitoring and regular thirty-minute physical checks carries a known or obvious risk of a constitutional violation. *See Rhyne*, 973 F.2d at 393 ("Absent evidence that [ten minute] periodic checks were obviously inadequate, we cannot find a jury question as to deliberate indifference."); *see also Clark v. McMillin*, 932 F.Supp. 789, 793 (S.D. Miss. 1996) (concluding as matter of law that policy of checking on pretrial detainees every fifteen minutes did not amount to deliberate indifference).

The Fifth Circuit has clearly held that there is no constitutional right to the detection of latent risks of suicide. *Id*. at 108. Insofar as there is no constitutional right to detection of latent suicide risks, it stands to reason that the failure to adopt a policy to detect such risks cannot be deliberately indifferent to a constitutional right. Accordingly, Denice's claim must fail to the extent it is based on an assertion that the City failed to implement a specific policy of suicide screening.[19]

### 3. Violation of Constitutional Right

Finally, a plaintiff must show "a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski*, 237 F.3d at 578. Where, as here, a plaintiff asserts a constitutional claim based on the failure to prevent a suicide, she must show that jail officials had "actual knowledge of the substantial risk of suicide and responded with deliberate indifference." *Hare*, 74 F.3d 633, 650 (5th Cir. 1996).

In seeking summary judgment, Defendants argue that "Plaintiff presents no evidence, including through deposition testimony or investigative reports, that <u>anyone</u> was aware that Damion Riggins suffered from any serious medical condition to which Defendants acted with deliberate indifference." Doc. #74 at 12 (emphasis in original). In response, Plaintiff argues that the officers were on notice of Damion's suicide risk because: (1) Denice called the station and informed an officer that Damion needed "special attention;" (2) Damion "told Hodge he had cocaine;" (3) Damion "was acting irate and combative;" and (4) Pate learned of Damion's previous suicide attempt earlier than he testified. Doc. #83 at 10–11.

As explained above, it is unclear that Denice called the station before her son's suicide. Even if she had, her vague description of a need for "special attention" was insufficient to place

---

[19] To the extent Denice argues there was no training in detecting obvious medical conditions, the claim must also fail because, as explained above, no record evidence supports such an assertion.

officers on notice of a suicide risk. *See Cox v. Glanz*, 800 F.3d 1231, 1253 (10th Cir. 2015) (inmate report that he needed to "speak with someone about problems" insufficient to place official on knowledge of substantial risk).

Next, neither potential drug use nor aggressive behavior, either alone or in combination, places an officer on notice of a substantial risk of suicide. *See Chennault v. Mitchell*, 923 F.Supp.2d 765, 783 (E.D. Va. 2013) ("Defendants Sink and Barnhouse knew that Brunson had ingested cocaine, was uncooperative and had attempted to assault Stith. Knowing that Brunson was behaving violently, however, is not the same as knowledge or reason to believe such violence might lead to suicide."); *Branton*, 261 F. App'x at 661 ("[C]ourts have not considered a detainee fighting with police officers as evidence that the detainee was suicidal.").

Finally, the undisputed evidence shows that Pate did not learn of Damion's previous suicide attempt until moments before discovering the body. Although Denice argues that this testimony is not credible because Pate testified that "the first thing" he does is conduct a background check, the testimony relied on by Denice seems to refer to Pate's process for starting a case file, not the process for arriving at the station. Doc. #83 at 6. Insofar as there is no evidence that Pate started his case file earlier than he testified, the Court finds Denice's contention regarding Pate's allegedly early discovery of the previous suicide attempt to be without merit. Furthermore, even if Pate learned of the 2005 suicide attempt at an earlier time than he testified, "a suicide attempt that is remote in time is insufficient to show a strong likelihood that suicide will result." *Calton v. Livingston*, No. H-09-2507, 2011 WL 2118700, at *13 (S.D. Tex. May 27, 2011) (suicide attempt three years earlier did not place officers on notice of substantial risk of suicide); *see also Lambert v. City of Dumas*, 187 F.3d 931, 937–38 (8th Cir. 1999) ("Even if the Appellee could show that one or more of the Appellants had actual

knowledge of the 1994 incident with the crack pipe, we would find this evidence insufficient to show that the officers knew that Lambert had present suicidal intentions upon arrest in May 1997, or that there was a strong likelihood that self-infliction of harm would result.") (internal quotation marks and alterations omitted).

Based on the authority above, the Court concludes that the indicators identified by Denice would not have placed an officer on notice of a substantial risk of suicide by Damion. Her § 1983 claim therefore must fail for this reason.

### 4. Conclusion

Denice has not identified a policymaker or a policy which was enacted with deliberate indifference. Furthermore, Denice has not shown that Damion suffered a constitutional deprivation. Accordingly, Defendants' motion for summary judgment is granted as to the § 1983 claim.

### B. State Law Claims

Having determined that Denice's § 1983 claim must be dismissed, this Court is divested of federal question jurisdiction. In such a situation, "the court must exercise its discretion whether to exercise supplemental jurisdiction" pursuant to 28 U.S.C. § 1367(c)(3). *Bass v. Parkwood Hosp.,* 180 F.3d 234, 246 (5th Cir. 1999). 28 U.S.C. § 1367(c) provides:

> The district courts may decline to exercise supplemental jurisdiction [if] (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Courts in the Fifth Circuit treat these four categories as "statutory factors" to consider when evaluating supplemental jurisdiction. *Enochs v. Lampasas Cty.,* 641 F.3d 155, 159 (5th Cir. 2011). Additionally, the Fifth Circuit requires consideration of the "common law factors [of]

judicial economy, convenience, fairness, and comity." *Id.* (citing *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988)).

When a district court dismisses all federal claims before trial, "the general rule is to dismiss any pendent claims." *Bass,* 180 F.3d at 246. The Fifth Circuit, however, "has consistently held that declining supplemental jurisdiction following a significant investment of judicial resources in the litigation constitutes an abuse of discretion." *Seals v. Mississippi,* 998 F.Supp.2d 509, 527 (N.D. Miss. 2014) (citing *Brookshire Bros. Holding, Inc. v. Dayco Prod. Inc.,* 554 F.3d 595, 602 (5th Cir. 2009)).

The Mississippi Tort Claims Act ("MTCA") permits lawsuits to be brought against employees of the state or any of its political subdivisions, including cities, based on "claims for money damages arising out of the torts of such governmental entities and the torts of their employees." Miss. Code Ann. § 11-46-5(1); *see City of Jackson v. Powell*, 917 So. 2d 59, 69 (Miss. 2005) ("Immunity under the MTCA protects the city from lawsuits arising out of the performance of a police officer's duties in law enforcement with respect to the alleged victim."). However, the MTCA also exempts governmental entities and their employees "acting within the course and scope of their employment or duties" from liability for certain kinds of claims. Miss. Code Ann. § 11-46-9(1). Denice's response specifically challenges the applicability of the § 11-46-9(1)(m) exemption, which applies to any claim "[o]f any claimant who at the time the claim arises is an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution …." Doc. #83 at 15 (citing Miss. Code Ann. § 11-46-9(1)(m)). Denice argues that the exemption is inapplicable because: (1) a lawful arrest was never made and Damion was

not, therefore, an "inmate;"[20] and (2) the holding cell at the Indianola police station does not qualify as a penal institution for purposes of the MTCA exemption.[21] *Id.* at 16. These arguments raise issues of interpretation not addressed by Mississippi courts. Therefore, Denice's state claim raises both complex and novel issues of state law and should be remanded.

In addition, the second statutory law factor weighs in favor of remand because the state law claims predominate over the now non-existent federal law claims. The third statutory factor weighs in favor of remand because the federal claim will be dismissed by this order. And, as explained below, the fourth factor, which incorporates the common law factors, weighs in favor of remand. *See Enochs,* 641 F.3d at 159 ("The fourth [statutory] factor also favors remand, as the heavy balance of the common law factors in favor of remand constitutes another compelling reason to decline jurisdiction.").

Turning to the common law factors, the judicial economy factor weighs in favor of remand because "at the time the federal claims were deleted hardly any federal judicial resources, let alone a significant amount of resources, had been devoted to the ... consideration of the ... state law claims (or to any claims)."[22] *Id.* The third common law factor also weighs in favor of remand because "it [is] certainly fair to have ... the purely ... state law claims heard in ... state court ...." *Id.* Finally, insofar as federal courts are "not as well equipped for determinations of state law as are state courts," the fourth common law factor of comity is served by remand. *Id.; see Diaz v. Estate of Lampton,* No. 3:09-cv–324, 2013 WL 3213087, at *16 (S.D. Miss. June

---

[20] Denice contends that Damion "had not been charged with any crime nor had he been convicted of any crime," but instead was simply speaking to Pate in one of the interview rooms as part of an ongoing investigation. Doc. #83 at 16.

[21] Denice raises this issue for the first time in her memorandum brief in response to Defendants' renewed summary judgment motion. Doc. #83 at 14-16.

[22] Apart from this order and the September order denying Defendants' first motion for summary judgment before the conclusion of discovery, the only orders in this case have been procedural. *See* Doc. #6; Doc. #14; Doc. #39; Doc. #41; Doc. #43; Doc. #51; Doc. #53; Doc. #57; Doc. #58; Doc. #81.

26, 2013) (dismissing state law claims "without prejudice so that a state court of competent jurisdiction may resolve them").

Upon consideration of the statutory and common law factors, the Court will follow the Fifth Circuit's general rule and decline to exercise supplemental jurisdiction over the state law claims. Accordingly, this matter must be remanded to the Circuit Court of Sunflower County. The Court therefore declines to consider the individual defendants' invocation of qualified immunity as to Count II.

## V
## Conclusion

For the reasons above, Defendants' renewed motion for summary judgment [73] is **GRANTED in Part and DENIED in Part**. It is GRANTED as to Denice's § 1983 claims and is DENIED as to her state law claims, over which this Court has declined to exercise its supplemental jurisdiction. This case is **REMANDED** to the Circuit Court of Sunflower County.

**SO ORDERED**, this 25th day of July, 2016.

/s/ Debra M. Brown
**UNITED STATES DISTRICT JUDGE**